# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAJ. FRED C. GALVIN (USMC, Ret.), )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THOMAS W. HARKER, )<br>in his official capacity as )<br>Acting Secretary of the Navy )<br>1000 Navy Pentagon )<br>Washington, DC  20350, )<br>)<br>and )<br>)<br>LLOYD AUSTIN, )<br>in his official capacity as )<br>Secretary of Defense )<br>1400 Defense Pentagon )<br>Washington, DC 20301, )<br>)<br>Defendants. )<br>_____ ) | Civil Action No. |

## COMPLAINT

Plaintiff Maj. Fred C. Galvin (USMC, Ret.) brings this action under 10 U.S.C. § 628(g)(2) and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*  As grounds therefor, Plaintiff alleges as follows:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

### PARTIES

3. Plaintiff Fred C. Galvin is a retired U.S. Marine Corps major.  Plaintiff resides at 21505 NW 164th Street, Platte City, MO 64079-8383.

4. Defendant Thomas W. Harker is the Acting Secretary of the Navy. Defendant Harker's principal place of business is 1000 Navy Pentagon, Washington, DC 20350. Defendant Harker is sued in his official capacity only.

5. Defendant Lloyd Austin is the U.S. Secretary of Defense. Defendant Austin's principal place of business is 1400 Defense Pentagon, Washington, DC 20301. Defendant Austin is sued in his official capacity only.

## STATEMENT OF FACTS

6. In February 2006, the Marine Corps selected Plaintiff to command Marine Special Operations Company Foxtrot ("Fox Company"), the first combat unit of the U.S. Marine Corps Forces Special Operations Command ("MARSOC").

7. MARSOC was activated in February 2006 and was little more than a concept when Plaintiff was chosen to lead its first combat unit. The new command was created to be the Marine Corps' contribution to the U.S. Special Operations Command, a unified combatant command of the U.S. Armed Forces. It was envisioned as a Marine Corps' fighting force similar to the Army's Green Berets and the Navy's SEALs

8. As the commander of the newly created Fox Company, Plaintiff was charged with developing the 120-Marine unit into an elite fighting force. Plaintiff was selected for this prestigious assignment based on his success leading specialized Marine reconnaissance units in combat in Iraq. In 2005, Plaintiff had been awarded a Bronze Star (with Combat V) for battlefield valor while leading a 1st Force Reconnaissance Company platoon in Iraq.

9. In February 2007, Plaintiff and Fox Company became the first-ever MARSOC combat unit deployed overseas – to Afghanistan in support of Operation Enduring Freedom.

10.     On March 4, 2007, Plaintiff and 29 members of Fox Company passed through the Afghan village of Bati Kot, near the Pakistan border, in a six-vehicle convoy.  Suddenly, a suicide bomber driving a fuel and explosive-packed van approached the convoy at a high rate of speed.  The van detonated, then fighters on both sides of the road opened fire on the convoy.  Fox Company fought back and escaped, returning to their base with only one minor casualty.

11.     Within thirty minutes of the convoy's return, internet reports falsely claimed that the convoy indiscriminately fired on civilians, killing and wounding many.  Mainstream media, including the *New York Times*, *Washington Post*, *USA Today*, and *The Guardian*, reported on the incident, relying on the initial internet reports as their source of information.

12.     Reports of the number of casualties varied greatly.  Some media outlets reported hundreds of casualties while the Afghan National Police reported eight dead and thirty-one wounded.  But only the headless, limbless torso of the car bomber from the incident was found.

13.     The following day, March 5, 2007, Afghan President Hamid Karzai publicly condemned Plaintiff and his Marines.  The incident sparked large anti-American protests in Afghanistan, resulting in more international media attention.

14.     On or about March 6, 2007, a U.S. Air Force colonel was appointed to investigate the Bati Kot ambush.  The investigation was supposed to include responses by Plaintiff and Fox Company, as well as evidence from American Explosive Ordnance Disposal (EOD) specialists.  The EOD specialists conducted an independent, post-blast study of the site and verified Plaintiff's and Fox Company's account of the ambush.

15.     The colonel discounted the version of events provided by Plaintiff, Fox Company, and the EOD specialists' conclusions and instead, relied on hand-picked statements of Afghan "witnesses," several of whom told the Naval Criminal Investigative Service that they made their

statements with the expectation of receiving solatium payments from the U. S. Government. The colonel ultimately recommended that seven Marines, including Plaintiff, be charged with dereliction of duty and/or negligent homicide.

16. Following the Bati Kot ambush, senior military leadership approved additional missions for Fox Company, but restricted Fox Company's field of operations. On or about March 9, 2007, a separate issue arose with respect to whether Marines in Fox Company had misled Plaintiff and other commanders about undertaking a mission in an area declared off-limits.

17. Within days of the Bati Kot ambush and the off-limits mission, Plaintiff and Fox Company were expelled from Afghanistan, and Plaintiff was relieved of command. At the time he was relieved, Plaintiff had conducted 39 combat missions in support of Operation Enduring Freedom – Afghanistan.

18. In April 2007, the Afghanistan Independent Human Rights Commission reported that at least twelve persons died and thirty-five were wounded in the Bati Kot ambush, including several women and children. The report suggested that an improvised explosive device attack took place but said there was little evidence of a simultaneous ambush. The report accused the Marines of firing indiscriminately at civilians traveling by foot or in vehicles as their convoy returned to base.

19. Plaintiff subsequently received an adverse fitness report for the period from June 1, 2006 to April 3, 2007, the first ever in his career. The report was highly critical of Plaintiff for the Bati Kot ambush and the off-limits mission.

20. In January 2008, a Court of Inquiry ("COI") convened to inquire into the Bati Kot ambush and the off-limits mission. The COI's mandate was to examine "the conduct of the

convoy, fire discipline, adherence to the Operations Orders, and Rules of Engagement, reporting and documentation of the incident and command climate in the Marine Special Operations Company-F (MSOC-F)." The COI met for over three weeks and heard from more than 45 witnesses.

21. In a report issued March 6, 2008, the COI exonerated Plaintiff and Fox Company and faulted both the Air Force colonel who investigated the incidents and senior U.S. leadership. It found that Plaintiff and Fox Company were ambushed in Bati Kot and defended themselves appropriately and proportionately. The COI identified no dereliction of duty or fault with respect to Plaintiff's and Fox Company's conduct and performance. The COI determined it was likely that 24-28 people were treated for injuries related to the suicide blast, small arms fire, and/or vehicle accidents. Additionally, the COI found there were likely five to seven deaths as a result of these same actions.

22. The COI also found that the Air Force colonel's findings and conclusions ran counter to the weight of the evidence and faulted senior U.S. leaders for being unable or unwilling to respond appropriately to what was described as an "enemy information operation." The COI also faulted senior U.S. leaders for failing to stand by Plaintiff and Fox Company until competent evidence had been gathered. Regarding the off-limits mission, the COI found that senior leadership was unable to distinguish between the off-limits mission and the Bati Kot ambush, although the two incidents were unrelated. According to the COI report, "The redeployment of [Fox Company] was based, in large part, on unsubstantiated allegations related to the 4 March 2007 incident. The decision to re-deploy [Fox Company] was influenced by the high level of command, media, and governmental attention focused on the 4 March 2007 incident."

23.     Despite the Court of Inquiry exoneration, the 2007 adverse fitness report remained in Plaintiff's service record.

24.     Plaintiff continued to serve his country faithfully, first as a MARSOC Component level training officer from April 2007 to December 2008 at Camp Lejeune, North Carolina, then as the Training and Operations Officer of the Third Marine Expeditionary Force's Special Operations Training Group ("III MEF SOTG"), an elite unit based in Okinawa, Japan, until November 2009.  The latter assignment not only was considered a "key leadership billet," but was "forward deployed" because it was overseas.  Both factors are accorded significant weight for promotion, as is serving in elite units like the 1st Force Reconnaissance Company, MARSOC, and III MEF SOTG.  Following his III MEF SOTG assignment, Plaintiff remained in Okinawa as Battalion Operations and Training Officer for 3D Reconnaissance Battalion, another "forward deployed," "key leadership billet" he would continue to hold until June 2011.

25.     Plaintiff was due to be considered for promotion to lieutenant colonel in August 2010, and fitness reports are a very significant factor in promotion selection.  Following the April 2007 adverse fitness report, the reports Plaintiff received were exceptional.  Plaintiff had three "relative values" of 100, the highest value possible, over three consecutive review periods between December 2008 and November 2009.  The reporting senior officer for the last fitness report Plaintiff received before being considered for promotion described Plaintiff as "Ready for promotion to Lt.Col. now – has the potential to make a solid [Battalion] commander.  I have not worked with a more committed and driven officer in 19 years."  The reviewing officer, a Brigadier General, concurred, characterizing Plaintiff as "one of the few exceptionally qualified Marines" and commenting, "Rank[s] in the top 5 percent of Majors I have known.  Promote and

slate to command a Recon Battalion or [Marine Special Operations Battalion]." The comments were finalized and submitted on July 11, 2010 and August 2, 2010, respectively.

26. But false narratives about the Bati Kot ambush continued to dog Plaintiff. On July 25, 2010, WikiLeaks released a set of documents labeled the "Afghan War Diary, 2004-2010," to the *New York Times*, *Der Spiegel*, and *The Guardian*. The "diary" was a compendium of over 91,000 reports covering the war in Afghanistan from 2004 to 2010, including U.S. military logs regarding the ambush. On July 26, 2010, *The Guardian* published a report that included the headline "Afghanistan war logs: How U.S. marines sanitised (sic) record of bloodbath; war logs show how marines gave cleaned-up accounts of incident in which they killed 19 civilians." Amnesty International described the logs as *prima facie* evidence of "violations of international Humanitarian Laws." The International Bar Association suggested the logs provided a basis to investigate the Marines involved in the ambush "for war crimes."

27. Little more than three weeks later, the FY 2012 Lieutenant Colonel Selection Board met on August 17, 2010 to consider candidates, including Plaintiff, for promotion to lieutenant colonel.

28. Although Plaintiff was exceptionally well-qualified for promotion as compared to his peers, the board did not select Plaintiff for promotion.

29. Plaintiff redeployed to Afghanistan in April 2011 and in June 2011 was the Operations Officer of the 3rd Reconnaissance Battalion in Helmand Province, another "key leadership billet" in an elite Marine unit deployed overseas in a combat zone.

30. On June 6, 2011, a Marine company in Plaintiff's battalion was decisively ambushed by enemy forces while on patrol in Afghanistan. The patrol requested fire support from the battalion, and Plaintiff, as the battalion operations officer, provided advice and

recommendations to the battalion commander on the timing, accuracy, appropriateness, and proportionality of the fire support to be provided.  The battalion commander ultimately rejected Plaintiff's recommendations, delayed providing support to the enveloped Marines for 50 minutes, then belatedly directed that one high-yield bomb and two higher-yield surface fired rockets be dropped dangerously close to the Marines' location, needlessly putting their lives at risk.  It was later determined that the enemy forces had left the area where the first of the high-yield munitions was dropped.

       31.     The following day, Plaintiff asked to speak to the commander about whether the commander intended that his decisions regarding the fire support provided to the Marines ambushed the previous day would apply to future enemy engagements.  The commander advised Plaintiff that, although it was his intent to provide fire support to engage the enemy and only the minimal amount of support necessary, the political environment in Afghanistan was "too politically sensitive" and that he was willing to sacrifice Marines' lives "for the greater good."  The commander told Plaintiff that he needed to know if Plaintiff was unable to execute his intent.  Plaintiff responded that he disagreed with the concept of having Marines maneuver against enemy forces in the absence of integrated fire support and be needlessly killed by disproportionate friendly fire instead of utilizing proportional and precise fire support on confirmed enemy positions.  Plaintiff asked to be relieved as the battalion's operations officer if the commander expected him to execute such unlawful orders.  The commander immediately relieved Plaintiff of his duties and issued Plaintiff an adverse fitness report.  More than a year later, the reviewing officer submitted a detailed addendum to the report, adding disparaging comments about Plaintiff.

32. Plaintiff was not selected for promotion by the FY 2013, FY 2014, or FY 2015 Lieutenant Colonel Selection Boards, held on August 23, 2011, August 14, 2012, and August 20, 2013, respectively.

33. Due to service limitations, Plaintiff involuntarily retired from the Marine Corps on March 31, 2014.

34. Plaintiff applied to the Board for Correction of Naval Records ("BCNR") to correct his service record in 2010, with respect to the 2007 adverse fitness report, and in 2013, with respect to the 2011 adverse fitness report, but both requests were denied despite Plaintiff having been found to have acted properly on both occasions.

35. Plaintiff petitioned the BCNR to correct his service record again on February 10, 2017, after his involuntary retirement.

36. On October 30, 2018, the BCNR issued a decision recommending that Plaintiff's service record be corrected by removing the two adverse fitness reports, a "Report of No Misconduct," and related material detailing the events of March 2007. A true and correct copy of the BCNR's recommendation is included herewith as Exhibit A.

37. In its recommendation, the BCNR described the Bati Kot ambush as having "corrupted the judgment" of the reviewing senior officer who prepared the report and that senior U.S. leaders fell victim to an "enemy information operation." The BCNR described the Marine Corps' treatment of Plaintiff as "collateral damage" from the enemy information operation. It also found that the ambush and its aftermath "set in motion events that contributed to the unsuccessful operations of 9 March 2007 and the perception [Plaintiff] lost operational control."

38. With respect to the 2011 adverse fitness report, the BCNR found that Plaintiff "rightfully took a moral stand" when he challenged his commander's "decision to needlessly

expose Marines and Afghan civilians to injury and death." It described the adverse fitness report as Plaintiff's commander's "unprofessional and unjustifiable response to being challenged about his tactical decisions which placed Marine lives at grave risk on 6 June 2011."

39. The BCNR also recommended that Plaintiff's failures to be selected for promotion to lieutenant colonel be removed and that a special selection board be convened to reconsider Plaintiff for promotion, among other relief. The BCNR specified that the special selection board consider Plaintiff for promotion as compared to candidates selected for promotion in FY 2012.

40. On January 2, 2019, Assistant Secretary of the Navy (Manpower & Reserve Affairs) Catherine L. Kessmeier adopted the BCNR's recommendation.

41. The law governing special selection boards, set forth at 10 U.S.C. § 628, requires a board to compare the record of the officer being considered for promotion against a sampling of officers of the same competitive category recommended for promotion by a regularly constituted promotion board, as well as against those officers who were not recommended for promotion by the board.

42. Except for materials the BCNR removed, the Special Selection Board was required by 10 U.S.C. § 628 to consider Plaintiff's service record as of August 17, 2010, the date the FY 2012 Lieutenant Colonel Selection Board met. Using these records, the Special Selection Board then was required to compare Plaintiff's record against a sampling of officers selected and not selected for promotion by the FY 2012 Lieutenant Colonel Selection Board.

43. The overall selection rate for the FY 2012 Lieutenant Colonel Selection Board for all Military Occupational Specialties ("MOS") was 68.4%. The overall selection rate for the FY

2012 Lieutenant Colonel Selection Board for Infantry officers, which was Plaintiff's MOS, was approximately 80%.

44.     Plaintiff had an exceptional service record as of August 17, 2010.  He had served in several key leadership billets, a significant marker for promotion.  He had extensive combat experience and had been "forward deployed" for more than three years, which also are significant markers for promotion.  He had received multiple awards, including a Bronze Star with Combat V, and received glowing comments recommending him for promotion.  Plaintiff also had completed his Professional Military Education promotion requirement by attending the Marine Corps Command and Staff College and completing the Intermediate Level School in 2008.  In addition, Plaintiff had significant "B Billets" outside his regular MOS demonstrating his diversified background as an officer, another marker for promotion.

45.     Plaintiff's performance ratings based on the eight fitness reports considered by the Special Selection Board also were outstanding.

46.     Fitness reports measure 14 different categories of performance.  Two publicly available studies compared aggregate, mean performance scores for lieutenant colonel candidates considered by promotion selection boards for FY 2004 through FY 2017.  *See* Jacob L. Reynolds, "Effect of Being an Aviator on Promotion to 0-5 in the USMC," *Naval Post Graduate School* (March 2011) ("Reynolds study") (FY 2004-12 data) (available at https://apps.dtic.mil/dtic/tr/fulltext/u2/a543334.pdf); Matthew R. Stolzenberg, "Exploring Marine Corps Officer Quality:  An Analysis of Promotion to Lieutenant Colonel," *Naval Post*

*Graduate School* (March 2017) ("Stolzenberg study") (FY 2013-17 data) (available at

https://apps.dtic.mil/dtic/tr/fulltext/u2/1046124.pdf).[1]

47. The Reynolds study considered 12 fitness report performance categories. For the 8 fitness reports considered by the Special Selection Board, Plaintiff's average score in each of the 12 performance categories exceeded the mean score of candidates selected for promotion in FY 2004-12. Attached as Exhibit B is a table from the Reynolds study that shows, among other data, the mean scores for each category, plus Plaintiff's average scores.

48. The Stolzenburg study considered 13 fitness report categories. Plaintiff's average score in each of the 13 performance categories exceeded the lowest mean score of the candidates selected for promotion in FY 2013-17. More telling, Plaintiff's average scores exceeded the highest mean score in nine performance categories, equaled the highest average score in one performance category, and were only slightly below the highest mean score in the remaining three categories of performance – only 0.43 lower than the highest mean score. Attached as Exhibit C is a table from the Stolzenberg study that shows, among other data, the mean scores for each reported category, plus Plaintiff's average scores.

49. Yet by memorandum dated July 25, 2019, Plaintiff was notified that he had not been selected for promotion. The memorandum states:

> Per the reference, your official military personnel file, as it would have appeared before the FY12 USMC Lieutenant Colonel Promotion Selection Board, was considered by a special promotion selection board. The special promotion board convened at this Headquarters on 23 April 2019. On 11 July 2019, the Office of

---

[1] The two studies use slightly different names for the various performance categories. The Reynolds study uses "M. Accom." for the "Mission Accomplishment – Performance" category and "M. Prof." for the "Mission Accomplishment – Proficiency" category. The Stolzenberg study uses "Mission Performance" and "Mission Accomplishment" for these same two categories. The Reynolds study does not include data for the "Intellect and Wisdom – Professional Military Education (PME)" category. The Stolzenberg study refers to this data as "PME."

>the Under Secretary of Defense for Personnel and Readiness approved the special selection board report. This correspondence is to officially inform you that you were not selected for promotion to the grade of lieutenant colonel in that approved board report. Please note that the approval of this special promotion selection board was based on material error of fact; therefore, you will not incur a failure of selection as a result of this special promotion selection board.
>
>If you have any questions, please contact Ms. Susan Reed, Officer Promotion Selection . . . .

50. Plaintiff was never provided an explanation – a "rational connection to the facts found and the choices made" – for why he was not promoted. *See*, *e.g.*, *Frizelle v. Slater*, 111 F.3d 172, 176-77 (D.C. Cir. 1997) (quoting *Motor Vehicle Mfrs. Ass'n, v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). On information and belief, no such explanation exists. On further information and belief, the Special Selection Board did not follow the requirements of 10 U.S.C. § 628.

51. Had Plaintiff been promoted, he would have been entitled to various remedies outlined by the BCNR in its recommendation, including having his record corrected to reflect a final rank of lieutenant colonel.

52. The unexplained denial of promotion also deprived Plaintiff of vindication for having been wrongfully accused of war crimes, as false accounts of the Bati Kot ambush continue to mar Plaintiff's good name and reputation and the good names and reputations of the Marines of Fox Company.

## COUNT I
### (Special Selection Board Review, 10 U.S.C. § 628(g)((2))

53. Plaintiff realleges paragraphs 1 through 52 as if fully stated herein.

54. The action of the Special Selection Board was arbitrary or capricious, not based on substantial evidence, the result of material error of fact or material administrative error, or otherwise contrary to law.

55. Plaintiff has been harmed by the Special Selection Board's action and will continue to be harmed unless and until that action is set aside.

56. Plaintiff has no adequate remedy at law.

## COUNT II
### (Administrative Procedure Act, 5 U.S.C. § 706)

57. Plaintiff realleges paragraphs 1 through 56 as if fully stated herein.

58. The July 11, 2019 decision denying Plaintiff a promotion is a final agency decision.

59. The denial violates the Administrative Procedure Act because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

60. Plaintiff has been harmed by the denial and will continue to be harmed unless and until the denial is set aside.

61. Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff respectfully requests that the Court: (1) declare the agency's denial to be unlawful; (2) remand this matter to the agency for further proceedings consistent with the Court's ruling; (3) award Plaintiff attorneys' fees and other litigation costs reasonably incurred in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A); and (4) grant Plaintiff such other relief as the Court deems just and proper.

Dated:  July 7, 2021                                      Respectfully submitted,

*/s/ Paul J. Orfanedes*
Paul J. Orfanedes
D.C. Bar No. 429716
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
(202) 646-5172

*Counsel for Plaintiff*