# EXHIBIT A



**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
701 S. COURTHOUSE ROAD, SUITE 1001
ARLINGTON, VA 22204-2490

JMP
Docket No: 367-17
OCT 30 2018

From: Chairman, Board for Correction of Naval Records
To: Secretary of the Navy

Subj: REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN ████ USMC

Ref: (a) 10 U.S.C. §1552
(b) MCO P1610.7F
(c) Phoncon with Mr. R. J. Toney of 16 Oct 18

Encl: (1) DD Form 149
(2) Fitness report for the reporting period 1 Jun 06 - 3 Apr 07
(3) Fitness report for the reporting period 1 Jun 11 - 7 Jun 11
(4) HQMC Route Sheet (w/enclosures) of 15 Jan 09
(5) Advocacy ltr from LtCol M of 1 Sep 16
(6) Advocacy ltr from Mr. D of 5 May 14
(7) Advocacy ltr from LtCol E of 16 Sep 16
(8) Advocacy ltr from Mr. B of 21 Oct 11
(9) Advocacy ltr from Maj W (undated)
(10) Advocacy ltr from GySgt F (undated)
(11) Advocacy ltr from Mr. M (undated)
(12) Advocacy ltr from Mr. B (undated)
(13) HQMC memo 1610 MMER/PERB of 20 Mar 13
(14) HQMC memo 1070 JAR1 of 12 Aug 10

1. Pursuant to the provisions of reference (a), Petitioner, a commissioned officer in the Marine Corps, filed enclosure (1), which consisted of two separate DD Forms and supporting documentation, with this Board requesting the following corrections to his record:

   a. Remove the fitness report for the reporting period 1 June 2006 to 3 April 2007.

   b. Remove the fitness report for the reporting period 1 June 2011 to 7 June 2011.

   c. Remove of the Report of No Misconduct dated 21 October 2008.

   d. Remove the failures of selection (FOS) incurred by the FY11, FY12, and FY13 Lieutenant Colonel (LtCol) Promotion Selection Boards. The Board noted that Petitioner incurred FOSs by the FY12, FY13, FY14, and FY15 LtCol Promotion Selection Boards, and therefore considered removal of these FOSs as Petitioner's implicit request.

Subj: REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN ████████ USMC

    e. Convene a Special Selection Board (SSB) for promotion to LtCol.

    f. Award constructive credit with back pay and allowances from the date of his mandatory retirement to the date of the Board decision,

    g. Direct corresponding changes to his retired grade and pay, and

    h. Per reference (c), Petitioner, through counsel, requested reinstatement to the Marine Corps.

2. This case, which combines two previously denied cases, NR20100011189 and NR20130002700, was reconsidered in accordance with Board for Correction of Naval Records procedures that conform to *Lipsman v. Secretary of Army*, 335 F. Supp. 2d 48 (D.D.C. 2004).

3. The Board, consisting of Mr. Spooner, Mr. Mizerak, and Mr. Ferraro, reviewed Petitioner's allegations of error and injustice on 24 May 2018 and, pursuant to its regulations, determined the corrective action indicated below should be taken on the available evidence of record. On 25 October 2018, the same Board reconvened to review Petitioner's additional request to be reinstated to the active duty Marine Corps. Documentary material considered by the Board consisted of the enclosures, relevant portions of Petitioner's naval records, and applicable statutes, regulations and policies. In addition, the Board considered the advisory opinion (AO) provided by Headquarters, Marine Corps Performance Evaluation Review Board (HQMC PERB) dated 20 March 2013, and the AO provided by HQMC/JAR1 dated 12 August 2010, which were obtained when reviewing the original submissions, NR20100011189 and NR20130002700.

4. The Board, having reviewed all the facts of record pertaining to Petitioner's allegations of error and injustice, finds as follows:

    a. Before applying to this Board, Petitioner exhausted all administrative remedies available under existing law and regulations within the Department of the Navy.

<u>FITNESS REPORT FOR PERIOD 1 JUNE 2006 TO 3 APRIL 2007</u>

    b. Petitioner was selected to command Marine Special Operations Company F (MSOC-F), the first unit of the Marine Corps Forces Special Operations Command (MARSOC) to operationally deploy in support of Operation Enduring Freedom-Afghanistan (OEF-A).

    c. On 4 March 2007, a six-vehicle convoy with 30 members of MSOC-F, to include Petitioner, were subjected to a complex ambush by enemy forces in the village of Bati Kot, Nangarhar Province, near the border with Pakistan when returning from Torkham Base along Highway A1, the main corridor linking Pakistan and Jalalabad, which is heavily trafficked and is a known corridor for the flow of weapons and drug-related materials into and out of Afghanistan. A Suicide Vehicle Borne Improvised Explosive Device (SVBIED) approached the convoy at a high rate of speed and detonated. The convoy defended against additional near-simultaneous

Subj:  REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN
       ███████████████ USMC

attacks, quickly regrouped, and resumed movement west on Highway A1 using authorized procedures to disperse the crowds and unblock the road to allowing the convoy to continue its westward route. Within 30 minutes of the blast, upon the convoy's return to base, internet media reports began surfacing indicating that a coalition convoy had opened fire on civilians, killing and wounding many.

    d. On or about 6 March 2007, Air Force Colonel (Col) P was appointed to conduct an investigation into the facts and circumstances surrounding the SVBIED and follow-on actions by the MSOC-F convoy. Col P concluded his investigation on 8 April 2007. Col P, discounting the statements of the MSOC-F convoy and the Explosive Ordnance Disposal specialists and placing great weight on the statements of the Afghani witnesses, reached the conclusion that there was no complex ambush and four of the Marines should be charged with negligent homicide. As discussed in paragraph 4.j. below, a Court of Inquiry concluded that Col P's "unbalanced approach to his investigation resulted in inaccurate conclusions."

    e. Following the ambush, on 5 March 2007, then-President Hamid Karzai publicly condemned Petitioner and his Marines, and the incident sparked large anti-American protests. Media reports of the number of casualties varied greatly. Certain media outlets reported hundreds of casualties while the Afghan National Police only reported eight dead and 31 wounded. However, no bodies were recovered. Additionally, solatium was paid in order to express sympathy for loss or injury, but was not an admission of guilt or wrongdoing. The payment of solatia in this case was considered very important in order to quell local unrest. However, testimony indicated that Afghanis have been known to fabricate statements and evidence in order to receive solatia payments.

    f. After the complex ambush of 4 March 2007, MSOC-F leadership continued to plan future missions, although they were restricted from operating in Jalalabad, and members involved in the ambush were ordered not to participate in future missions except in exigent circumstances, until further notice. On 7 March 2007, after extensive preparations with his Platoon Commanders, Petitioner submitted the Concept of Operations (CONOPS) for staffing and approval of three missions (reconnaissance, cache-recovery, and vehicle-recovery). The three missions developed by Petitioner and his Platoon Commanders did not violate previous orders to not operate in Jalalabad. However, unbeknownst to Petitioner, one of his Platoon Commanders had "masked" the reconnaissance mission, falsely indicating a route transiting through Jalalabad, and arriving at a final mission location far south of Jalalabad. The true intent of the operation was to operate only in and around Jalalabad. Later, a confirmation brief was held with all mission-essential personnel; Petitioner was not in attendance. The 9 March 2007 missions, which included a detailed route that clearly identified the reconnaissance mission objective as Jalalabad, not the southern location as indicated in the "masked" CONOP, were approved. On 9 March, questions were raised as to the true location of the reconnaissance mission and the team was recalled before the convoy reached its destination. To compound problems, the next mission, the cache-recovery mission, was involved in an accident when a vehicle in the convoy swerved to avoid a man-made obstacle placed on a highway at night. The Platoon returned to base. Petitioner was informed that the vehicle-recovery mission was approved. One of the vehicles on this mission

3

Subj:  REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN ███ USMC

was also involved in an accident when the brakes on the towed vehicle seized, causing both vehicles to roll. The Platoon was able to return to base, and there were only slight injuries sustained from the two accidents that evening.

    g. The deception regarding the reconnaissance CONOP route and other problems encountered by MSOC-F on 9 March 2007, amplified by the 4 March 2007 ambush, led to the loss of trust and confidence in Petitioner and MSOC-F to operate in support of OEF-A.

    h. Petitioner was issued enclosure (2), an adverse fitness report for the period 1 June 2006 to 3 April 2007 due to a loss of trust and confidence resulting in Petitioner's relief of command and the redeployment of MSOC-F from OEF-A.

    i. In a modified convening order dated 14 November 2007, the Commander, U.S. Marine Corps Forces, Central Command (COMMARCENT) directed the convening of a Court of Inquiry (COI) to inquire into the facts and circumstances relative to the actions of MSOC-F.

    j. The COI's investigative hearings convened on 7 January 2008 and adjourned on 29 January 2008. Based on more than three weeks of live testimony and a complete review of all documentary evidence presented in the case, the COI found the statements and the testimony of the personnel in the MSCO-F convoy to be consistent, truthful, and credible, and recommended that no punitive and/or adverse administrative action be taken against the personnel of the MSOC-F convoy. The COI found that Petitioner and the MSOC-F Marines defended appropriately and proportionately against the 4 March 2007 enemy ambush, and that a non-governmental-organization employee's unbiased testimony independently corroborated the testimony of the MSOC-F personnel. Further, there was no failure or dereliction of duty by Petitioner relative to his performance of duty. The COI opined that the findings and conclusions found in Col P's investigation (para 4.d.) run counter to the weight of the evidence considered by the Court. It was noted that Col P initially believed the Marines' version of the 4 March 2007 events as contained in the MSOC-F after-action briefs, but changed his opinion after inspecting the vehicles and interviewing Afghani witnesses. However, Col P never issued an Article 31b Uniform Code of Military Justice (UCMJ) rights advisement to any personnel in the MSOC-F convoy, even though some of these personnel were interviewed more than once, including interviews conducted after Col P inspected the vehicles and interviewed Afghani witnesses. Additionally, Col P never interviewed the Reconnaissance Operations Center (ROC) watch officer on duty on 4 March 2007, nor did he review the ROC log to determine the sequence of events on 4 March 2007 to determine exactly what was reported and to whom it was reported. Based on his conclusion that the use of force applied by the personnel in the convoy was excessive, Col P recommended various personnel in the MSOC-F convoy be charged with dereliction of duty and/or negligent homicide in violation of the UCMJ. With regard to the incidents of 9 March 2007, the COI determined that Petitioner's approval of three missions, his absence at the confirmation briefs for all three missions, and his Executive Officer's (XO) "masking" of his CONOP, all resulted in Petitioner's loss of operational control on 9 March 2007. The COI, therefore, found Petitioner's relief from command and adverse fitness report were appropriate, but that no further action should be taken against him.

4

Subj:  REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN ███ USMC

 k. On 21 October 2008, COMMARCENT, the designated Consolidated Disposition Authority for any administrative or disciplinary corrective actions resulting from the investigation into MSOC-F incident, after thoroughly considering the COI report, decided to give Petitioner a non-punitive letter of caution. The COMMARCENT did not recommend Petitioner be required to show cause for retention on active duty before a Board of Inquiry (BOI).

 l. On 4 December 2008, the Commandant of the Marine Corps (DC, M&RA), after reviewing the COMMARCENT recommendation, determined the information provided did not warrant processing Petitioner for administrative separation and directed the case be closed. Adverse material concerning this matter was directed to be inserted into Petitioner's official military personnel file (OMPF). Petitioner was afforded the opportunity to comment and submit matters for inclusion in his OMPF but did not submit additional matters.

 m. In his application dated 10 February 2017 at enclosure (1), Petitioner contended that the 1 June 2006 to 3 April 2007 adverse fitness report is factually inaccurate, erroneous, and unjust. Specifically, his relief and premature redeployment from Afghanistan were the direct result of gross errors in judgment by senior U.S. military officials and the extraordinary dereliction of duty of Major (Maj) U. But for the unprofessional and disproportionate response to the Taliban's false allegations of a massacre, Petitioner contends he would not have been relieved of command, issued an adverse fitness report, or prematurely removed from the battlefield. The assertion of "multiple missteps involving Fox Company" are factually incorrect and, as the COI concluded, the alleged errors that led to Petitioner's relief were attributed to other individuals and gross systemic failures. Petitioner asserts the following summarized errors, with detailed explanation in his application, regarding the adverse fitness report:

 1) The ambush of 4 March 2007 was not a tactical "misstep." The COI found the convoy's response was irreproachable and found no fault relative to the Marines' conduct and performance. The only misstep was the inability or unwillingness of senior U.S. leaders to respond appropriately to an enemy information operation and stand by the troops until competent evidence was gathered.

 2) Col P's investigation (from para 4.d.) was discredited and the magnitude of his errors cannot be overstated. Col P was in possession of overwhelmingly clear evidence that MSOC-F was ambushed on 4 March 2007 and responded in a discriminate and effective manner. Col P suppressed exculpating evidence and inexplicably accepted the testimony of the Afghans he stopped, apparently randomly, and questioned, making no effort to ascertain the location of those Afghans on 4 March 2007 and making no effort to corroborate their statements. Col P did not examine key locations, did not interview any of the Afghans allegedly injured by the Marines, and did not examine ammunition logs. Col P's investigation was explicable only as gross negligence or as a mission with a predetermined outcome. Had Col P properly and ethically discharged his duties as Investigating Officer, there would have been no COI, no public assertions by senior leaders that the unit had killed innocent civilians, no redeployment, no relief of Petitioner, and no adverse fitness report.

Subj:  REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN ███████████ USMC

3) But for the restrictions placed on the unit after the ambush of 4 March 2007, Petitioner contends the events of 9 March 2007, which provided the trigger for the redeployment, would not have occurred. On 9 March 2007, there were no tactical missteps, there was no error in judgment by Petitioner, nor did he lose operational control. The CONOPS he briefed were approved by leadership, and the fact that he was deceived by his XO does not mean Petitioner lost operational control. Further, senior leadership had no objection to the three missions when they were approved, but then criticized Petitioner for conducting them on the same night after the accidents occurred. Additionally, the senior leadership grossly overreacted to the events based in large part on Maj U's deceptive e-mail and power point essentially placing blame on MSOC-F for failure to effectively support and communicate when the identified failures were, in reality, his own. The COI correctly determined senior leadership was unable to distinguish between the 4 March and 9 March 2007 events, although they were unrelated, and linking the events led to the diminished trust and confidence.

4) The adverse fitness report employs language that violates reference (b). Specifically, comments were vague, ambiguous, and replete with innuendo; the fitness report was not marked derogatory although based on derogatory information; and the events were still under investigation.

5) The adverse fitness report is inequitable and unjust because it was not fair to relieve him. The enemy information operation and responses of senior U.S. Army leaders were the proximate causes of the redeployment and contested fitness report. The fitness report is also inequitable and unjust because none of the other senior leaders suffered any adverse consequences but their contribution to the redeployment far exceeds Petitioner's alleged missteps.

6) The catalogue of errors documented by the COI and described in the advocacy letter at enclosure (5) compels the Board to void the fitness report. Enclosure (5), submitted by LtCol M, a member of the COI states, in part, "[Petitioner] performed his duty as a Marine Officer in combat in an exemplary manner. As the COI shows, [Petitioner] was beset by a perfect storm of toxic officers. [Petitioner's] fitness report is not based on the true facts of the matter." LtCol M, a distinguished combat veteran, who has commanded Marines at the platoon and battery level, and U.S. Army, British and Afghan Army soldiers at the (provisional) battalion level, enthusiastically recommends the BCNR favorably endorse Petitioner's request for relief.

7) The BOI of 8 March 2012 (discussed further in para 4.w.), employing the preponderance of the evidence standard of proof, substantiated none of the allegations of substandard performance. The BOI effectively concluded Petitioner did not lose operational control and did not demonstrate deficient leadership.

n. In correspondence attached as enclosure (13), the office having cognizance over the subject matter addressed in Petitioner's original application (NR20100011189) has commented both the adverse fitness report and the Report of No Misconduct should remain in Petitioner's OMPF. Specifically, the AO noted neither the Reporting Senior (RS) or Reviewing Officer (RO)

Subj:  REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ USMC

mentioned an ongoing investigation. Additionally, the decision to include enclosure (4), the Report of No Misconduct in Petitioner's OMPF as adverse material, despite the Show Cause Authority's decision to not process Petitioner, was without error.

## FITNESS REPORT FOR THE PERIOD 1 JUNE 2011 TO 7 JUNE 2011

(The following facts are gleaned from Petitioner's submission, supporting documentation to include the statements and BOI transcripts, and the fitness report. As stated by the RO in the contested fitness report, an investigation into the following event was not conducted because the RO concluded "no investigation was required because the facts were not in dispute".)

o. On 6 June 2011, Petitioner served as Operations Officer, 3d Reconnaissance Battalion, in Helmand Province, Afghanistan. On that day, enemy forces ambushed elements of Bravo Company who were on patrol some 1200 meters from the operations center where Petitioner was located. Throughout the duration of that day's operations, Petitioner monitored Bravo Company communications alongside LtCol H, the Battalion Commander. The Battalion had continuous fire support from a HIMARs battery as well as Close Air Support (CAS) aviation assets (USMC AV-8B Harriers, a single USAF MQ-9 armed Reaper Drone Unmanned Aerial System (UAS), and a single USMC KC-130J Harvest Hawk with weapons platform). Repeatedly throughout the operation, LtCol H sought Petitioner's advice on which type of weapons would be deployed in the situation. (Note: detailed discussion contained in the fitness report) At first, the recommendations were heeded but later action was directed by LtCol H that did not match Petitioner's recommended choice of weapon. Eventually, LtCol H decided, in response to Bravo Company's requested fire support, no additional fire support would be ordered and complained that the Marines needed either to maneuver forward or disengage.

p. The next morning, Petitioner requested to speak with LtCol H about the ambush and LtCol H's choices of fire support. Petitioner states he specifically asked whether the restrictions on the use of fire support LtCol H employed were to remain in effect as his "policy." Petitioner states LtCol H said all he had ever learned and trained for told him to utilize fire support to protect his Marines and destroy the enemy, but that in the political environment of Afghanistan it was "too politically sensitive" and that he was "willing to sacrifice the lives of these Marines for the greater good."

q. Petitioner contends LtCol H told him that if he were having a "crisis of conscience" about LtCol H's use of force restrictions, then LtCol H "needed to know." Petitioner responded that he believed LtCol H should have used lower-yield weapons systems during the 6 June attack due to the high risk of collateral damage. Petitioner also informed LtCol H that he believed additional fire support was appropriate due to the calls for such support by the commander on the ground. When the discussion was resumed later in the day, LtCol H reiterated his "need to know" if Petitioner was unable to execute his intent. Petitioner states he informed LtCol H that he disagreed Marines should needlessly die when proportionate and precise firing support could prevent their deaths. He further stated that he "could not be responsible for ordering Marines to needlessly die" and that if LtCol H expected him to do so, he requested to be relieved as the

Subj: REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN ███████ USMC

Battalion Operations Officer. LtCol H responded "Then effective immediately, you are relieved of your duties."

 r. On 7 June 2011, LtCol H issued Petitioner enclosure (3), an adverse fitness report, specifically marking him adverse for effectiveness under stress and judgment, because he did not "trust the MRO to make appropriate judgment calls across the contemporary spectrum of conflict, especially in situations involving 'war among the people'." In his rebuttal, Petitioner requested to have the incident fully investigated immediately in order to "prevent the loss of lives of innocent Afghan civilian lives and those of 3d Recon Battalion Marines, Corpsmen, or civilian attachments due to untimely, inaccurate, inappropriate, and unproportional fire support solutions approved, or appropriate fire support requests denied, by the Battalion Commander." Petitioner specifically requested an investigation into the facts surrounding LtCol H's approval of utilizing specific munitions with the highest yield of collateral damage that were available on that day as well as LtCol H's denial of fire support to his Marines, Corpsman, partnered Afghan National Army Soldiers, and civilian contractors who were under fire from multiple positions. The RO concurred with the RS's comments and markings, specifically stating "MRO is questioning the judgment of his commander in combat which I find unacceptable."

 s. More than one year later, at the request of HQMC/PERB, Petitioner's RO submitted a detailed addendum to the report. The RO addressed Petitioner's issues and determined that, although the Performance Evaluation System is not the appropriate venue for requesting an investigation, an investigation was not warranted because the substantive facts were not in dispute. Per the RO, "Tactical reporting, legal analysis, and my personal discussions with the RS led me to conclude no investigation was required because the facts were not in dispute." The RO further stated "Counterinsurgency Operations (COIN) require that Marines are placed at risk in order to defeat the enemy while protecting the civilian population." The RO concluded the actions of the RS "were well within the RS's tactical decision making discretion and in compliance with the Tactical Directive." The RO "found no reason to question the judgment of the Commander…I have no reason to believe this Commander would needlessly 'sacrifice' Marines…I find that the RS knew what was required to gain the support of the people and turn them against the insurgency."

 t. In his rebuttal to the adverse fitness report addendum, Petitioner commented that the RO's comments were made over a year after the fact and Petitioner's perception was that they were "made in retaliation for my Department of Defense Inspector General (IG) Complaint". Petitioner had been trained as a Joint Terminal Attack Controller and was a Fire Support Coordination and Close Air Support instructor. Petitioner provided polygraph evidence showing the RS had made the statement he was "willing to sacrifice the lives of the Marine for the greater good". Petitioner stated, in his addendum, that "these comments completely violate the morals and ethics which we receive and are obligated to abide by as Marine Officers."

 u. The 3rd Officer Sighter, which appears to be the RO, concluded the RS was justified in relieving Petitioner. "As RO I do not dispute whether or not LtCol H made any specific

Subj:  REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN
       ███████████████ USMC

reference to accepting increased risk or 'sacrificing' Marines. It is irrelevant because I have already determined I had 'no reason to believe this Commander would needlessly sacrifice Marines as perceived by the MRO."

    v. Petitioner contended, in part, that the adverse fitness report from 1 June 2011 to 7 June 2011 is factually inaccurate, erroneous, and unjust. Specifically, Petitioner contends the following alleged errors led to his relief and the adverse fitness report:

    1) LtCol H's lack of competence and his deployment of weapons in contravention of mandatory guidance is the issue and not Petitioner's inability or refusal to accept the combat parameters of counterinsurgency. Petitioner contends he was correct to challenge LtCol H's choice of weapons because the choice violated mandatory guidance and needlessly exposed Marine and Afghan civilians to injury and death.

    2) LtCol H's choice of weapons systems were contrary to the tactical directive in effect. Specifically, the choice did not facilitate any of the objectives to mitigate risk, avoid excessive use of force and related potential for injuries/death, or limit damage to physical structures.

    3) The fitness report unfairly paints Petitioner as an officer ignorant of the operational requirements and tactical limitations of counterinsurgency and/or as one who refused to accept those requirements and limitations.

    4) The fitness report falsely claims Petitioner experienced "mental turmoil" and contains other factual inaccuracies.

    5) He was legally correct to refuse to support LtCol H's unlawful decisions, and for that, he was relieved of duty and given a career-ending fitness report. Punishing a Marine for doing the lawful and morally correct thing is simply unjust.

    6) The contested fitness report is LtCol H's unprofessional and unjustifiable response to being challenged about his ineffectiveness as a commander in circumstances where Marine lives were at grave risk.

    7) He properly and professionally questioned LtCol H's judgment in combat because of his demonstrated disregard for Marines and Afghan civilians through his choice of weapon systems.

    w. A BOI was convened after a LtCol selection board, in accordance with its duties as outlined in the selection board precepts, reviewed Petitioner's two adverse fitness reports and determined Petitioner should be required to show cause for retention. The BOI was convened on 8 March 2012 to consider relevant facts and determine whether Petitioner should be discharged from the naval service by reason of substandard performance of duty considering the two adverse fitness reports from combat, one from March 2007 and one from June 2011. The BOI, after listening to several witnesses including LtCol H, determined the preponderance of evidence substantiated none of the reasons for discharge and recommended the case be closed.

Subj: REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN ███████ USMC

x. In correspondence attached as enclosure (13), the office having cognizance over the subject matter addressed in Petitioner's original application (NR20130002700) has commented, in part, that Petitioner's fitness report was administratively correct and procedurally complete. The PERB found Petitioner took a moral stand and ultimately asked to be relieved when he found himself unable to support his Commander's intent in combat. The fitness report was rendered adverse because the RS lost trust and confidence in Petitioner's ability to execute the Commander's intent. In summary, PERB found Petitioner had not met the burden of proof necessary to establish an inaccuracy or injustice warranting the removal of the report.

y. The FY12 LtCol Promotion Selection Board convened on 17 August 2010. The contested fitness report ending 3 April 2007 was available for consideration when Petitioner incurred his first FOS. Petitioner failed selection on each successive Promotion Selection Board until he retired on 31 March 2014, after achieving sufficient service for retirement. The contested fitness report ending 7 June 2011 was available for consideration by the FY14 and FY15 Promotion Selection Boards.

z. Petitioner submitted enclosures (6) through (12), a variety of advocacy letters in support of his applications for relief.

CONCLUSION

Upon review and consideration of all the evidence of record, the Board concluded Petitioner's request warrants partial favorable action.

The Board determined Petitioner overcame the issues raised in the HQMC/JAR1 AO provided at enclosure (14). Specifically, the Board, after noting Petitioner was exonerated by the COI for the response to the 4 March 2007 ambush, concluded this event corrupted the judgment of the RS and ultimately resulted in Petitioner being removed from theater. The Board determined the enemy information operation and responses of senior leaders were the proximate cause of the MSOC-F redeployment and actions taken against Petitioner were "collateral damage." The Board determined the events of 4 March 2007 set in motion events that contributed to the unsuccessful operations of 9 March 2007 and the perception Petitioner lost operational control. The Board also noted the March 2012 BOI did not find Petitioner's performance during the March 2007 incidents was substandard. The Board concluded it was unjust for Petitioner's adverse fitness report for the period of 1 June 2006 to 3 April 2007 to remain in his OMPF. The Board also determined it was unjust for the Report of No Misconduct and related material detailing the events in March 2007 to remain in Petitioner's OMPF.

The Board determined that, although Petitioner's adverse fitness report for the period of 1 June 2011 to 7 June 2011 was administratively and procedurally correct, it was unjust for the fitness report to remain in Petitioner's record. Specifically, the Board, after reviewing all documentation, evidence, and statements provided by Petitioner, found Petitioner rightfully took a moral stand when he challenged LtCol H's decision to needlessly expose Marines and Afghan civilians to injury and death. Based on its review of all submitted documentation, the Board

Subj:   REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN
        ███████████████ USMC

determined LtCol H, as contended by Petitioner, expressed his view that the political environment of Afghanistan was "too politically sensitive" and made the statement that he was "willing to sacrifice the lives of these Marines for the greater good." The Board also noted the March 2012 BOI, after listening to LtCol H's testimony, did not find Petitioner's performance during the June 2011 events was substandard. The Board relied upon the BOI's determination over the RO/3rd Sighter's review of the adverse fitness report because the BOI members questioned and heard testimony from relevant witnesses, including extensive testimony from LtCol H. The Board concluded the adverse fitness report was LtCol H's unprofessional and unjustifiable response to being challenged about his tactical decisions which placed Marine lives at grave risk on 6 June 2011 and, as such, shall be removed from Petitioner's OMPF.

Upon the removal of the adverse fitness reports for 1 June 2006 to 3 April 2007 and 1 June 2011 to 7 June 2011, the Board determined all failures of selection shall be removed and an SSB shall be convened to consider Petitioner for selection to promotion to LtCol.

The Board concluded that, if Petitioner is selected for promotion to LtCol, he is entitled to constructive credit with back pay and allowances from the date of his promotion to LtCol until he fulfills the three-year time-in-grade requirement. .

Lastly, the Board determined it was premature to consider Petitioner's request for reinstatement to the active duty Marine Corps if selected for promotion to LtCol.

RECOMMENDATION

In view of the foregoing, the Board finds the existence of an error warranting the following corrective action.

Petitioner's record be corrected by removing enclosure (2), the fitness report for the reporting period 1 June 2006 to 3 April 2007.

Petitioner's record be corrected by removing enclosure (3), the fitness report for the reporting period 1 June 2011 to 7 June 2011.

Petitioner's record be corrected by removing enclosure (4) the Report of No Misconduct and related material detailing the events in March 2007.

Petitioner's naval record be corrected by removing his failures of selection incurred by the FY12 through FY15 LtCol Promotion Selection Boards.

An FY12 USMC LtCol SSB be convened, and if selected, and providing he is duly appointed to LtCol/O5, by and with the advice and consent of the Senate, then:

    (a) assign the corresponding FY12 date-of-rank;


Subj:  REVIEW OF NAVAL RECORD ICO RETIRED MAJ FRED C. GALVIN
       ███████████████ USMC

(b) extend his active duty service from 31 March 2014 to 30 June 2015, and make his active duty retirement effective 1 July 2015;

(c) issue an updated DD Form 214 that reflects changes to his final grade/rank as LtCol/O5 and recalculated record of service;

(d) update his pay records to indicate he served as a LtCol/O5 for his last three years of active service, ending on 30 June 2015;

(e) allow for all back pay and allowances for the period of 1 June 2012 to 30 June 2015 that reflects paygrade O5; and

(f) the Defense Finance and Accounting Service (DFAS) will complete an audit of Petitioner's records and make payment of any money that Petitioner may be entitled to.

Any material or entries inconsistent with or relating to the Board's recommendation be corrected, removed or completely expunged from Petitioner's record, that no such entries or material be added to the record in the future. This includes but is not limited to all information systems/data base entries which reference and/or discuss the material being expunged.

No further relief be granted.

5. Pursuant to Section 6(c) of the revised Procedures of the Board for Correction of Naval Records (32 Code of Federal Regulations, Section 723.6(c)) it is certified that a quorum was present at the Board's review and deliberations, and that the foregoing is a true and complete record of the Board's proceedings in the above entitled matter.

6. The foregoing action of the Board is submitted for your review and action.

*[signature]*
ELIZABETH A. HILL
Executive Director

Reviewed and Approved / Disapproved

*[signature]*
Jan 2, 2019

12